# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2016 Term**

_____

No. 15-0037

_____

**FILED**

**June 16, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
Respondent

v.

**NICHOLAS VARLAS,**
Petitioner

_____

**Appeal from the Circuit Court of Brooke County**
**The Honorable Martin J. Gaughan, Judge**
**Criminal Action No. 13-F-63**

**REVERSED AND REMANDED**

_____

**Submitted: March 1, 2016**
**Filed: June 16, 2016**

Carl A. Frankovitch, Esq.                    Patrick Morrisey
M. Eric Frankovitch, Esq                     Attorney General
Frankovitch, Anetakis, Colantonio            David A. Stackpole
  & Simon                                    Assistant Attorney General
Weirton, West Virginia                       Charleston, West Virginia
Counsel for the Petitioner                   Counsel for the State

**CHIEF JUSTICE KETCHUM delivered the Opinion of the Court.**

**JUSTICE BENJAMIN concurs, in part, dissents, in part, and reserves the right to file a separate opinion.**

**SYLLABUS BY THE COURT**

1.      "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."  Syllabus Point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

2.      "Assessments of harmless error are necessarily content-specific. Although erroneous evidentiary rulings alone do not lead to automatic reversal, a reviewing court is obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affected the substantial rights of a criminal defendant."  Syllabus Point 4, *State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996).

3.      Rule 412 of the West Virginia Rules of Evidence provides the standard for the introduction at trial of a victim's sexual history, and it supersedes W.Va. Code § 61-8B-11 [1986] to the extent that the statute is in conflict with the rule.

Chief Justice Ketchum:

In this appeal from the Circuit Court of Brooke County, defendant Nicholas Varlas appeals an order convicting him of second-degree sexual assault and of attempting to commit first-degree sexual abuse. Because the circuit court erred in excluding relevant evidence critical to Varlas's defense, we reverse its order of conviction and remand the case for a new trial.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Varlas lived in Follansbee, West Virginia. According to the prosecution's evidence at trial, at about 11:00 p.m. on August 12, 2012, a group of people drove to Varlas's residence so that some of them could "hang out and drink." The visitors arrived at the same time, but in separate vehicles. In one car rode Varlas's friend, Jeremy Smith; Smith's girlfriend, Jena Lindsey; and Lindsey's two young children. Alone in her own car was Lindsey's friend, N.S.[1] Lindsey had previously given N.S.'s cell phone number to Varlas, and, the day before, Varlas and N.S. had exchanged a brief series of friendly, flirtatious text messages. After the group had socialized for two hours or longer, Lindsey left to drive her elder child around for a while so that he might fall asleep.

---

[1] We identify the victim in this sensitive matter by referring to her exclusively by her initials. *See* W.Va.R.App.P. 40(e)(1); *State v. Lewis*, 235 W.Va. 694, 698 n.2, 776 S.E.2d 591, 595 n.2 (2015); *see also* W.Va.R.Evid. 412(e) (specifying that a "victim" of sexual misconduct "includes an alleged victim").

1

At 2:08 a.m., as N.S. sat in the den on a sofa, Varlas, from elsewhere in the house, began to send her text messages of an explicit nature suggesting that they engage in certain sexual acts. N.S. responded to those texts with one-word negatives. At about the same time, N.S. was conversing via text with her boyfriend, Travis Shepard, to let him know where she was. Shepard initiated the final three exchanges in that conversation:

> 2:16: You promised no other guys, and now you two [Lindsey and N.S.] are with a different guy, not cool at all.
>
> 2:16: He's 33.
>
> 2:17: Why did you guys go there?
>
> 2:17: Idk [probably "I don't know."]
>
> 2:18: Well, I'm gonna trust you, just remember, if you do something with someone else, I'm gone for good.
>
> 2:19 I knoww [sic].

After a while, Lindsey returned with her son still awake, then left again with Smith and both of her children to drive around for a bit longer. N.S. admitted some discomfort at the prospect of being alone with Varlas and conveyed her trepidation to Lindsey, but she nonetheless remained behind.

According to the prosecution, after Lindsey and Smith's exit, N.S. accompanied Varlas to the living room and sat down on the couch. Varlas played a pornographic movie on the television; he then removed his shirt, sat down next to N.S., and began to kiss her. N.S. tried to fend off Varlas, but—the prosecution contended—his kisses and gropes became more insistent. N.S. told the jury that Varlas pushed her shorts

2

and underwear aside, forcing sexual intercourse. After Varlas finished and vacated the room, Lindsey and Smith returned for a bit before the entire group departed the residence for the evening. N.S. did not tell Lindsey or Smith that she had been assaulted.

N.S. met Shepard in person to tell him what had happened, and then she went home to sleep. From shortly after 6:00 a.m. until almost 8:00 a.m., a period of slightly less than two hours, Shepard sent the following twenty-nine texts to N.S.:

[6:03]: You need to call the cops!

[6:26]: Where are you?

[6:42]: [N.], you need to go to the hospital and you need to file charges. If you don't file charges, that just shows me you wanted to have sex with him.

[6:45]: Then why can't you go to the hospital and file charges? You need to have justice served on him.

[6:46]: So you just let it happen? That's real [expletive] nice. [H]e's getting his ass beat tomorrow.

[6:49]: You still need to file charges. Please [N.], do this for me.

[6:51]: The cops will keep it private, no one will know, just the cops and court. The news won't get your name or anything, I promise.

[6:52]: You don't have to, they'll keep it down low, I promise. Just please, go to the cops with me.

[6:54]: You need to, this guy needs to go to jail for what he did to you, he [expletive] raped you, who knows if he has any [sexually transmitted diseases]. If he [ejaculated], if he's a sex offender you need to file charges.

[6:55] (1): Are you going to file charges?

[6:55] (2): No, I swear I didn't.

3

[6:57]:No, I didn't tell your parents, but [i]f you don't press charges, I will.

[6:59]:You need to press charges [N]. [I]t pissed me off more than anything that someone [expletive] you tonight, all I asked was no other guys, then I find out you went along with him to watch a movie? Wtf.

[7:02]:It just bothers me that you won[']t file charges, did you have sex with [him] then regret [i]t afterw[a]rds? Tell me what really happened.

[7:04]:You need to file charges on him, he [expletive] raped you, you can't let him get away with it.

[7:07]:Time is a big factor in rape cases [N]. [Y]ou need to talk to the cops soon.

[7:10]:Because, they need to see if they can collect a semen sample, check you for STDs, and internal injuries, and get you help.

[7:14]:Then whatever, I'm done trying, obviously there's something more than you['re] telling me, I told you, if you had sex with him, and it wasn't rape just tell me now, because if it was rape, [you] wouldn't be keeping it to yourself, and not getting yourself [expletive] tested. Goodnight.

[7:23]:All I wanted to do was help, and you wanna let him get away with it.

[7:34]:I told you, have sex with anyone else. I'm gone.

[7:35]:You shouldn't [have] ever went there. Goodnight.

[7:36]:Nor should you [have] walked away with him by yourself to watch a movie.

[7:41]:Apparently, you were next to him on the [expletive] couch and [expletive], and left his hand on your leg for a long time. I don't know what to [expletive] believe, if you honestly got raped, or you just [expletive] him. I[']m going to bed.

4

[7:44]: I told you before you [expletive] went, no other boys, or I'm gone, you say you got raped but won't file charges, seems like you're hiding something and trying to keep me from not getting mad. [B]ut until you press charges, I'm done. Bye.

[7:48]: It was such a simple [expletive] request, no other boys, or I'm gone, you say you got raped but won't file charges, seems like you're hiding something and trying to keep me from not getting mad. [B]ut until you press charges, I'm done. Bye.

[7:51]: I'm done until you prove to me that it was rape and not just you [expletive] him and regretting it, if you go file charges by the time I wake up, but until then, I'm going with you [expletive] him. [G]oodnight.

[7:52]: I'm done until you prove to me that it was rape and not just you [expletive] him and regretting it, if you go file charges by the time I wake up, then I'll believe you and do everything I can to make you happy, but until then, I'm going with you [expletive] him. [G]oodnight.

[7:54]: First of all, you never should [have] went there, secondly, you should of hit or bit him if you didn't wanna [expletive] him, and thirdly, you should have called the cops by now. That's why I don't believe you. That's why I think you [expletive] him on your own will.

[7:56]: Good job at whoring around. This just shows me how you really are. If it was rape, you would [have] already called the cops.

To the extent that N.S. may have responded to the foregoing texts, her responses are not in the record.

Shortly thereafter, Shepard arrived at N.S.'s residence, and she agreed to accompany him to the police station and report the incident. Varlas was later interviewed by the police and denied having had sexual contact with N.S. Laboratory analysis, however, revealed Varlas's sperm on N.S.'s shorts, and an accompanying fluid sample

5

disclosed mixed DNA from N.S. and Varlas.  On November 4, 2013, the grand jury returned a two-count indictment against Varlas, charging him in Count One with sexual assault in the second degree, *see* W.Va. Code § 61-8B-4 [1991], and in Count Two with attempting to commit sexual abuse in the first degree, *see id.* § 61-8B-7(a)(1) [2006].[2]

On the first morning of the defendant's jury trial, on September 3, 2014, the circuit court asked the lawyers whether there was any "rape shield evidence," referring to a particular type of evidence whose admissibility is specifically governed by West Virginia Rule of Evidence 412.  This Rule provides, in pertinent part:

> **(a) Prohibited Uses.**  The following evidence shall not be admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>
> (1) evidence offered to prove that a victim engaged in other sexual behavior; [or]

---

[2] West Virginia Code § 61-8B-4(a)(1) provides, in pertinent part, that "[a] person is guilty of sexual assault in the second degree when . . . such person engages in sexual intercourse . . . with another person without the person's consent, and the lack of consent results from forcible compulsion."  The offense is distinguished from sexual assault in the first degree in this instance by the absence of serious bodily injury or the use of a deadly weapon in committing the act. *Cf. id.* § 61-8B-3(a) (2006).  Pursuant to West Virginia Code § 61-8B-7(a)(1), the offense of sexual abuse in the first degree is committed when the perpetrator "subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion." The term "sexual contact" is defined as "any intentional touching, either directly or through clothing, of . . . any part of the sex organs of another person . . . where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party." *Id.* § 61-8B-1(6) (2007).  The indictment here alleged that Varlas "attempted to place his finger in the vagina of N.S. without the consent of N.S." *See also id.* § 61-11-8(2) (2002) (setting forth punishments applicable to "[e]very person who attempts to commit an offense, but fails to commit or is prevented from committing it").

6

(2) evidence offered to prove a victim's sexual predisposition . . . .

**(b) Exceptions.**

(1) *Criminal Cases.* The court may admit the following evidence in a criminal case: . . .

(B) . . . evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor;

(C) evidence of specific instances of the victim's sexual conduct with persons other than the defendant . . . if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto; and

(D) evidence whose exclusion would violate the defendant's constitutional rights.

W.Va. R. Evid. 412 [2014]. Rule 412 (which revised and recodified former Rule 404(a)(3)) took effect on September 2, 2014, the day before Varlas's trial, and it was therefore the controlling authority with respect to the circuit court's query.

In response to the circuit court's inquiry about rape shield evidence, counsel for Varlas responded, "There's a number of text messages between the alleged victim[] and her on-again-off-again boyfriend," including "after the alleged assault . . . where she told him she was assaulted and he doesn't necessarily believe her and says, 'If you don't report this you're a whore and I don't believe you.'" The prosecutor opposed admitting the texts, though acknowledging that N.S.'s "reluctance to report the crime, the fact that she discussed it with the boyfriend and the boyfriend pushed her to report the crime, I think that's relevant."

7

The conversation concerning the texts continued in general terms, as neither party had yet produced them to be scrutinized in detail. The circuit court pondered that

> part of the text messages may be admissible. Anything that has to do with her prior sexual behavior is [barred] by the rape shield statute. The allegation that he put pressure on her to bring the charge is admissible. I don't think that's covered by the rape shield at all . . . . I don't know if her alleged argument with the boyfriend is an issue in this case. So that might come in after we hear some testimony. But if it's related directly to sex, I just think that it comes out as it relates only to her alleged boyfriend.

After further discussion, the court expressed doubt that the text messages would be admissible, but equivocated that "[i]t will depend on the testimony. Do not hesitate to approach the bench if you think the door is opened. . . . These are rulings on motions in limine, it's subject to what happens in trial, whether it becomes more relevant and more likely to come in."

The subject was next broached, again in generalities, not long after defense counsel had begun his opening statement to the jury:

> [DEFENSE COUNSEL]: You'll also hear about a series of text messages from an on-again-off-again boyfriend of the victim immediately after this, later that night into the morning. You will hear that this gentleman is the father of her child. They're in an on-again-off-again relationship. You will hear that he does not believe her and indicates that he will not—
>
> [PROSECUTOR]: Objection, Your Honor. Can we approach? . . . .
>
> (at the bench) First off, I don't know if this man has been subpoenaed to testify, number one. And number two, we touched on the fact that his opinion, whether she was telling the truth or not is inadmissible in trial. He just opened that

8

door. Whether or not he believes the victim is not an appropriate question (inaudible)—

[DEFENSE COUNSEL]: —(inaudible) why he did not believe her. He would not believe her until she reported it. That is why he tells her to report it.

THE COURT: As I indicated before, I think it's admissible, but whatever else might come out of your mouth may not be. But that is.

[PROSECUTOR]: It's admissible to ask a witness whether they do or do not believe allegations made by a victim?

THE COURT: No. Did he pressure her to testify or report this incident to the police is admissible.

[PROSECUTOR]: I agree with what you just said. He just said here how this man didn't believe her. That's completely different than where he pressures her. I disagree that that's admissible.

[DEFENSE COUNSEL]: *If I can get the exact text message he sent*, that message said that I would believe you if you report this. He calls her a vulgar name and says until you report this—

THE COURT: *Okay. I don't think that you're permitted to get into all that. You are able to get into the fact of the pressure he applied to her, that I'm going [to] find admissible evidence.*

(emphasis added). Later, during the State's examination of N.S., the prosecutor elicited that she had received text messages in which Shepard had used "very vulgar terms" to pressure her to report the assault to the police. At that point, counsel for Varlas asked to approach the bench, where the following colloquy ensued:

[DEFENSE COUNSEL]: Your honor, I wanted to get a clarification I believe the text messages from Mr. Shepard are not hearsay, because I'm not going to be offering them for the truth. They'll be offered for why she may have reported it. I

9

believe *I should be able to get into the exact substance of those text messages* and I wanted to get a ruling on that before we did that. . . .

THE COURT: He wants to go further.

[PROSECUTOR]: Yes. He wants put in specifically that he's calling her a slut and that he's saying things like that in the text message, which is blatantly being done to try to embarrass and to—which is the whole point of this evidence not coming in. She already answered that he was putting pressure on her. If he wants to follow up and ask a question that she doesn't want to answer—the only reason [you] did this was because he pressured you, that's one thing. The text messages don't add any light to that.

[DEFENSE COUNSEL]: It does to the amount of pressure that he was putting on her.

THE COURT: *I think that there's already been testimony to the effect that he used foul language when he was putting the pressure on her. I think that's enough.*

[DEFENSE COUNSEL]: Okay. Note my objection, please.

(emphasis added).

Among the other witnesses testifying for the prosecution was Timothy Robertson, Jr., the police officer assigned to investigate the matter by the Follansbee Police Department. Officer Robertson's testimony had adhered strictly to the facts of the investigation until the prosecutor asked him, "In your experience and training in handling these types of matters, is it unusual for sexual assault victims to be reluctant in reporting of sexual assault?" Defense counsel objected to the question, contending that no evidentiary foundation had been established concerning the officer's experience and training that would permit him to answer.

10

The circuit court acknowledged the objection and invited the prosecutor to have the witness elaborate. The prosecutor complied by eliciting from Officer Robertson that he had received relevant training from the West Virginia State Police, and that he had previously investigated one other sexual assault. Defense counsel renewed the objection challenging Officer Robertson's expertise, but the circuit court determined that "he can testify as an expert as to what he has learned in class, and I'm going to permit that. Keeping in mind this is not his personal experience. It's what he's been told by someone during training." Thereafter, Officer Robertson told the jury that "[i]n the training we were administered, they advised us that most sexual assault victims never come forward, they're too ashamed or embarrassed."

Varlas testified in his own defense, admitting that he had sexual intercourse with N.S., but insisting that the entire encounter was consensual. At the close of all the evidence admitted during the two-day trial, the jury was instructed and deliberated for about two hours before finding Varlas guilty of both counts as alleged in the indictment. Varlas timely moved for a new trial, maintaining that Shepard's text messages had erroneously been excluded. The motion set forth the messages in their entirety for the first time.

The circuit court declined to grant Varlas's motion, explaining in its sentencing order of January 5, 2015, "that the denial of the admission of the text messages into this trial, as outlined on the record, was appropriate, reaffirming its previous rulings and denying the defendant's request for a new trial based upon the failure to admit the same." Varlas was thereafter sentenced to one to three years in prison

11

on his conviction of attempted first-degree sexual abuse, as set forth in Count Two of the indictment, with a consecutive term of ten to twenty-five years on the Count One conviction of second-degree sexual assault. The circuit court suspended the longer term, however, instead imposing five years' probation and requiring Varlas to register as a sexual offender for ten years.

Varlas now appeals his convictions, contending that Shepard's text messages were excluded in error, and that Officer Robertson was improperly permitted to offer expert testimony concerning rape trauma syndrome.[3]

## II. STANDARD OF REVIEW

"A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." *See* Syllabus Point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). An evidentiary ruling exceeding the circuit court's discretion does not require that the defendant's conviction be disturbed, however, if the resulting error is harmless. *See* W.Va. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). An error impinges on the defendant's substantial rights if it is prejudicial, that is, if it "affected the outcome of the proceedings in the circuit court,

_____

[3] In *State v. McCoy*, 179 W.Va. 223, 226, 366 S.E.2d 731, 734 (1988), we explained that "rape trauma syndrome" is a term used to "describe certain physical and emotional symptoms experienced by rape victims," the acute phase of which is "characterized by certain physical and emotional reactions, including fear, humiliation, anger, revenge, and self-blame."

12

and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice."  Syllabus Point 9, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).  Further, we held in Syllabus Point 4 of *State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996) that:

> Assessments of harmless error are necessarily content-specific.  Although erroneous evidentiary rulings alone do not lead to automatic reversal, a reviewing court is obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affected the substantial rights of a criminal defendant.

## III.
## ANALYSIS

### A.  Shepard's Texts

Constitutionally, "[t]his Court has plenary authority to promulgate rules of procedure, which have the force and effect of law."  *State v. Wallace*, 205 W.Va. 155, 160, 517 S.E.2d 20, 25 (1999).  *See also*, W.Va. Const., Art. VIII, § 3 ("The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the state[.]"); *Louk v. Cormier*, 218 W.Va. 81, 93, 622 S.E.2d 788, 800 (2005) ("Promulgation of rules governing litigation in the courts of this State rests exclusively with this Court.").  Because of this constitutional power, "[t]he West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts."  Syllabus Point 7, in part, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).  A rule of evidence promulgated by this Court "has the effect of a statute in matters of procedure and supersedes any procedural statute which conflicts with

13

the rule." *State ex rel. Wilson v. County Court of Barbour County*, 145 W.Va. 435, 442, 114 S.E.2d 904, 909 (1960).

This appeal concerns Rule 412 of the West Virginia Rules of Evidence. Rule 412 "is intended to provide the standard for the introduction of evidence of a victim's sexual history." W.Va. R. Evid. 412 cmt. The comments to the Rule state it was adopted by this Court to "supersede[] the rape shield statute, W.Va. Code § 61-8B-11, to the extent that the statute is in conflict with the rule." *Id.*[4] Accordingly, we now hold

---

[4] W.Va. Code § 61-8B-11 [1986] provides:

(a) In any prosecution under this article in which the victim's lack of consent is based solely on the incapacity to consent because such victim was below a critical age, evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible. In any other prosecution under this article, evidence of specific instances of the victim's prior sexual conduct with the defendant shall be admissible on the issue of consent: Provided, That such evidence heard first out of the presence of the jury is found by the judge to be relevant.

(b) In any prosecution under this article evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, That such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

(c) In any prosecution under this article, neither age nor mental capacity of the victim shall preclude the victim from testifying.

(continued . . .)

14

that Rule 412 of the West Virginia Rules of Evidence provides the standard for the introduction at trial of a victim's sexual history, and it supersedes W.Va. Code § 61-8B-11 [1986] to the extent that the statute is in conflict with the rule.

The primary purpose of Rule 412 is "to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." *Id. See also, State v. Guthrie*, 205 W.Va. 326, 339, 518 S.E.2d 83, 96 (1999) (observing that rape shield law is designed "to protect the victims of sexual assault from humiliating and embarrassing public fishing expeditions into their sexual conduct; to overcome victims' reluctance to report incidents of sexual assault; and to protect victims from psychological or emotional abuse in court as the price of their cooperation in prosecuting sex offenders"). The Rule excludes "evidence offered to prove that a victim engaged in other sexual behavior." W.Va. R. Evid. 412(a)(1).

None of the text messages at issue detail N.S.'s past sexual history. Shepard's statements in those text messages do relate to sexual conduct, but between N.S. and defendant Varlas; Rule 412 expressly permits the introduction of that evidence. *See* W.Va. R. Evid. 412(b)(1)(B) (permitting, except where otherwise prohibited by section (a)(3), "evidence of specific instances of a victim's sexual behavior with respect to the

(d) At any stage of the proceedings, in any prosecution under this article, the court may permit a child who is eleven years old or less to use anatomically correct dolls, mannequins or drawings to assist such child in testifying.

15

person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor"); *cf.* Syllabus Point 1, *Guthrie*, 205 W.Va. at 330, 518 S.E.2d at 87 (observing that, pursuant to the rape shield statute, only the victim's sexual conduct "with persons other than the defendant" is excluded). We therefore find that under Rule 412, the circuit court abused its discretion when it prevented defendant Varlas from admitting and using the text messages.

We further conclude that the circuit court's exclusion of the text messages warrants a new trial. The analysis boils down to whether the erroneous exclusion of so much relevant evidence can be ignored as not prejudicing the defendant. In that vein, the number of messages must be considered along with their substance, as an important part of Varlas's defense was to illustrate the intensity of the barrage that Shepard directed at N.S. to report the incident. Of course, even had the twenty-nine messages been admitted, the jury could still have found Varlas guilty based solely on the testimony of N.S. Beyond the mere sufficiency of the evidence, however, we are required by the applicable standard of review, as expressed in *Blake*, to gauge the prejudice to Varlas attendant to the exclusion.

We find that the circuit court's exclusion of the subject text messages placed the underlying fairness of the entire trial in doubt, because Varlas was entitled to have the jury informed of the extent to which Shepard may have pressured N.S. to report the incident as a crime. On direct examination, N.S. agreed with the prosecutor's leading questions that Shepard had sent her "a series of text messages," that he was "putting pressure" on her to report what had occurred, and that he was "using very vulgar terms"

16

toward that end. From such a vague account, the jury could hardly have divined the avalanche of twenty-nine texts and their insistent tone; the circuit court's ruling thus resulted in an important aspect of the case being grossly deemphasized. Where a defendant's conviction depends predominantly on the jury's assessment of the victim's credibility and the excluded evidence bears on that issue, the potential for prejudice is at its zenith. *See State v. Jonathan B.*, 230 W.Va. 229, 240–41, 737 S.E.2d 257, 268–69 (2012) (exclusion of victim's notebook in which she documented prior sexual intercourse without mentioning defendant was not harmless given that State's case relied "almost completely" on the victim's testimony).

Because the essential evidence at issue was improperly excluded from the jury's consideration at the first trial of this matter, a new trial is necessary.

### B. Officer Robertson's Testimony

While not strictly necessary to our decision to reverse Varlas's convictions, we briefly address the issue of Officer Robertson's testimony insofar as it is reasonably likely to recur at retrial. The prosecution did not offer Officer Robertson as an expert. Still, the circuit court remarked in front of the jury that he could "testify as an expert as to what he has learned in class." To the contrary, Officer Robertson's minimal training and his prior experience amounting to a single case was insufficient as a matter of law to qualify him to offer expert testimony regarding rape trauma syndrome. *See State v. M.M.*, 163 W.Va. 235, 242, 256 S.E.2d 549, 554 (1979) ("limited and superficial contact" with subject area failed to evidence requisite "significant skill and knowledge" required

17

to testify as an expert). Additionally, unless a witness has been qualified as an expert, the witness is specifically precluded from offering an opinion "based on scientific, technical, or other specialized knowledge[.]" W.Va. R. Evid. 701.

Officer Robertson was thus left to testify as a lay witness to give his account of what he had been told in police training about sexual assault victims in general. That testimony was unadorned hearsay. It was also irrelevant to the situation at hand, given the lack of any specific evidence that N.S. herself had suffered severe emotional trauma from the rape, or that the trauma had manifested itself in her reluctance to report the same. *See M.M.*, 163 W.Va. at 242, 256 S.E.2d at 554 (remarking that even testimony by qualified experts is inadmissible where opinions are "not founded on a sufficient knowledge of [the subject's] background"). To be sure, and as we have recognized time and again, our rape shield protections were devised in part to overcome the demonstrated phenomenon that victims of sexual assault are often reluctant to come forward and notify the authorities. In individual prosecutions, however, due process demands that courts necessarily deal with specifics and not with generalities.

Ordinary jurors, in view of their collective experience and the exercise of their common sense, would almost certainly be familiar with the general reticence of sexual assault victims, even had Officer Robertson not testified on the subject. Moreover, the prosecutor did not overtly attempt to link the general proclivities of sexual assault victims to N.S.'s particular reaction, a conclusion that necessarily can be drawn only by an expert. We are nonetheless troubled by the apparent efforts to imply such a connection to explain N.S.'s hesitation in reporting the particular conduct on trial. If, on

18

retrial, the State wishes to demonstrate that the incident itself played a significant role in N.S.'s reluctance to report, it must do so through competent, expert evidence derived from and pertinent to N.S. herself.

## IV.  CONCLUSION

We reverse the circuit court's order of January 5, 2015, convicting Varlas of the two charges set forth in the indictment.  The matter is remanded to the circuit court for a new trial and such other proceedings as may be consistent with this opinion.

The Clerk is further directed to issue the mandate in this action forthwith.

Reversed and Remanded.