IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

_____

No. 15-1145
_____

FILED

**June 16, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

PAUL DARREN SPINKS,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Nicholas County
The Honorable Gary L. Johnson, Judge
Criminal Action No. 14-F-87

AFFIRMED

_____

Submitted: May 3, 2017
Filed: June 16, 2017

J. Steven Hunter, Esq.                  Patrick Morrisey, Esq.
Robert P. Martin, Esq.                  Attorney General
Steve Hunter Associates, l.c.           Zachary Aaron Viglianco, Esq.
Lewisburg, West Virginia                Assistant Attorney General
Counsel for Petitioner                  Charleston, West Virginia
                                        Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.       "Except for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." Syllabus, *Barker v. Fox*, 160 W.Va. 749, 238 S.E.2d 235 (1977).

2.       "'Most courts hold that as a general rule, a trial court should not grant a motion to dismiss criminal charges unless the dismissal is consonant with the public interest in the fair administration of justice.' Syl. Pt. 12, in part, *Myers v. Frazier*, 173 W.Va. 658, 319 S.E.2d 782, 786 (1984)." Syllabus Point 4, *State ex rel. Pinson v. Maynard*, 181 W.Va. 662, 383 S.E.2d 844 (1989).

3.       "'Dismis[s]al of [an] indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations.' *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261-62, 108 S.Ct. 2369, 101 L.Ed.2d 228, 238 (1988) (citing *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring))." Syllabus Point 6, *State ex rel. Pinson v. Maynard*, 181 W.Va. 662, 383 S.E.2d 844 (1989).

4.    "'[A] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to a review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998))." Syllabus Point 1, *State v. Varlas*, 237 W.Va. 399, 787 S.E.2d 670 (2016).

5.    "'Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.' Syl. Pt. 1, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990)."  Syllabus Point 3, *State v. Morris*, 227 W.Va. 76, 705 S.E.2d 583 (2010).

6.    "It is within a trial court's discretion to admit an out-of-court statement under Rule 803(1), the present sense impression exception, of the West Virginia Rules of Evidence if: (1) The statement was made at the time or shortly after an event; (2) the statement describes the event; and (3) the event giving rise to the statement was within a declarant's personal knowledge."  Syllabus Point 4, *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995).

7.      "When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction." Syllabus Point 1, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

8.      "Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should

instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence." Syllabus Point 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

9. "It is presumed a defendant is protected from undue prejudice if the following requirements are met: (1) the prosecution offered the evidence for a proper purpose; (2) the evidence was relevant; (3) the trial court made an on-the-record determination under Rule 403 of the West Virginia Rules of Evidence that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave a limiting instruction." Syllabus Point 3, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

10. "The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." Syllabus Point 4, *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988).

11.    "'The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982).' Syl. Pt. 1, *State v. Jones*, 174 W.Va. 700, 329 S.E.2d 65 (1985)." Syllabus Point 3, *State v. Wilkerson*, 230 W.Va. 366, 738 S.E.2d 32 (2013).

12.    "'Jury instructions on possible guilty verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' Syl. pt. 5, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980)." Syllabus Point 1, *State v. Leonard*, 217 W.Va. 603, 619 S.E.2d 116 (2005).

13.    "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

v

proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

14.    "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus Point 2, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

15.    "When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that

best fits the prosecution's theory of guilt." Syllabus Point 3, *State v. LaRock*, 196 W.Va.

294, 470 S.E.2d 613 (1996).

WALKER, Justice:

Petitioner Paul Darren Spinks ("Petitioner") appeals the November 1, 2015, order of the Circuit Court of Nicholas County sentencing him to life imprisonment without the possibility of parole for the 2007 murder of his wife. Petitioner asserts that the trial court erred by: (1) refusing to dismiss the indictment returned by the grand jury based upon fraud; 2) improperly admitting evidence of prior domestic violence, marital discord, and threats made by Petitioner against his wife; 3) refusing to instruct the jury on lesser included offenses; and 4) denying his motion for judgment of acquittal when the evidence presented at trial was insufficient to support his conviction. Upon consideration of the parties' briefs and arguments, the submitted record and pertinent authorities, we affirm Petitioner's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial was that at 1:06 p.m. on October 31, 2007, Petitioner placed a 911 call claiming that he and his wife, Elizabeth Spinks, had been shot from a distance by an unknown shooter while seated on the front porch of their home. According to Petitioner's recorded statement taken by police at the hospital, Petitioner and Elizabeth were seated on their front porch smoking when Petitioner heard what he thought was a "firecracker", and Elizabeth "stood up and grabbed her . . . neck and fell

1

down on the porch in front of [him]."[1]  Petitioner stated that upon seeing Elizabeth drop to the ground, he ran into the house to get their cell phone to call 911, came back out onto the porch, and while bending over Elizabeth to check her and talking to the 911 dispatcher, he likewise sustained a gunshot wound to his left thigh.

Petitioner stated that after calling 911, he went back into the house and into their bedroom, where he continued to talk with the dispatcher and tell her what had occurred.  According to his recorded statement, Petitioner then got Elizabeth's gun, a .300 Winchester Magnum, out of the gun cabinet and went into the bathroom to hide for fear that the shooter would come into the house and try to kill him.  He remained in his home and made other telephone calls while waiting for an ambulance and officers to respond to the scene.[2]  He contended that during the wait, he passed out twice.  He also stated that he dropped the phone and had to look for it in the pool of blood on his bathroom floor.

---

[1] Elizabeth was shot in the upper left chest.  Petitioner stated that at the time of the shooting, he and Elizabeth were sitting face-to-face on the porch.  He described that Elizabeth was sitting with her back facing the house and he was sitting with his back away from the house.

[2] Pursuant to the evidence admitted at trial, Petitioner's cell phone records revealed that he made thirteen phone calls between the time of his initial 911 call and when he exited his house to meet law enforcement officers and first responders.  Three of those calls were made to 911.  The other calls were made to Petitioner's mother and father, BB&T bank, and two other unidentified numbers.

Petitioner was still inside the residence when emergency personnel arrived. He emerged from the home when the 911 dispatcher instructed him to exit the house. The officers who responded to the scene, West Virginia State Police Sergeants Ron Lilly and Anthony Webb, testified that when Petitioner exited the residence, his hands appeared to be clean despite the fact that his leg was bleeding very heavily. Moreover, while Petitioner was lying on his back as paramedics prepared to transport him from the scene, Petitioner, stretching back and pointing up over his head, called Sergeant Lilly's attention to a bullet hole located on the front of the house. Petitioner was flown to the hospital for medical treatment.

In his recorded statement taken at the hospital by Corporal B.J. Wriston, a West Virginia State Police trooper, Petitioner indicated that when he was out on the porch calling 911, he saw an older model white Chevrolet truck sitting in the lower end of the parking lot of a nearby elementary school. He surmised that the shots possibly may have come from that truck. When Corporal Wriston asked if Petitioner and Elizabeth had been having any marital problems, Petitioner denied any. When Corporal Wriston asked if they had any problems with anyone else in the past, Petitioner stated that a man named Harvey Hersman had been calling Elizabeth's cell phone in the last six months threatening Petitioner, claiming that he was going to burn down their house and garage. Petitioner indicated, however, that Mr. Hersman had not made any calls threatening him for approximately the last month. When asked if Mr. Hersman had ever

3

specifically threatened to shoot Petitioner during these calls, Petitioner replied that "[h]e had told some other people that, and it got word back around to me, but he – he's the type of person I figure he'd get somebody else to do it. . . . But my wife never done nothing." Before concluding the statement, Corporal Wriston asked whether Petitioner had anything to add, and Petitioner said, "I'd like you to check my hands for powder or whatever they do . . . because I didn't fire no gun. She didn't fire no gun."

At approximately 4:15 p.m., a West Virginia State Police crime scene response team arrived at the Spinks' residence and thoroughly investigated the scene, collecting numerous pieces of evidence. Corporal H.C. Mitchell, a West Virginia State Police trooper, testified that he collected a fired .22 caliber bullet from a bookcase located in the living room of the residence, which appeared to have traveled through a plastic chair on the porch and the siding on the front of the house. Corporal Mitchell also recovered a Savage Model 110E, caliber .222, Remington rifle from a gun cabinet in the bedroom. West Virginia State Police Sergeant Robert Richards collected a second fired .22 caliber bullet from the front porch and another gun, a .300 Winchester Remington Model 700, located on the bathroom floor.[3] Sergeant Ron Lilly, a detachment commander for the West Virginia State Police who was the custodian of the evidence in

---

[3] Darren Francis, an employee of the West Virginia State Police Forensic Laboratory ("State Forensic Lab"), testified that he tested both of the bullets retrieved from the scene, and neither had any blood on them.

this case, testified that several other guns were seized and taken from Petitioner's residence. However, only three were submitted to the West Virginia State Forensic Lab for testing because the wound that Elizabeth suffered appeared to be from a smaller caliber gun.

West Virginia State Police Sergeant Bruce Clendenin, the lead investigator on the case, testified that there was a significant amount of Petitioner's blood inside the house, on the floor of the bathroom, and in the bedroom. Moreover, various witnesses testified that although there was no trail of blood leading from the porch into the house, there was a pool of blood in the bathroom leading into the master bedroom and less toward the front door. Sergeant Clendenin testified that one thing that stood out as odd to him that day was that the bathroom sink was wet, freshly used. Sergeant Clendenin took several measurements at the crime scene, in particular of the bullet hole in the siding of the house in relation to the green lawn chair that also appeared to have a bullet hole in it. He noted that there was no blood on any of the porch furniture or the walls, and that the majority of the blood was underneath Elizabeth's body and nowhere else.

Sergeant Clendenin also testified that when he and other officers were searching Petitioner's home, he observed a small hump or "puffed up" disturbance in the carpet on the bathroom floor, so the carpet was cut back in that area and he observed what he believed to be an apparent bullet hole in the bathroom floor. The portion of the

particle board floor containing this hole was cut out by Sergeant Anthony Webb and was placed into evidence. Sergeant Lilly testified that the piece of carpet laying over the bullet hole did not have a hole in it. Sergeant Clendenin also testified that officers conducted a search underneath the home to retrieve a bullet, but because there was a large amount of nails and metal debris underneath it, their metal detectors were unable to locate anything.

The question of whether the hole in the bathroom floor was caused by a bullet was in dispute at trial. Philip Cochran, a firearm and tool-mark examiner employed with the State Forensic Lab, testified that he could not confirm by the presence of chemical residue that the hole was caused by a bullet. However, he testified that the damage to the wood and the size of the hole were not inconsistent with having been caused by a bullet. He stated that if a bullet had passed through carpet or padding before going through the wood, any of the residues that he would have been looking for would have been removed, and thus, he did not rule out the possibility that the hole in the bathroom floor was caused by a bullet. He also determined that of the guns submitted to the State Forensic Lab for testing, none of the firearms matched the two bullets that were found at the scene.

Additionally, Koren Powers, an employee of the State Forensic Lab who worked in the trace evidence section, conducted gunshot residue testing and determined

that no gunshot residue was found on either Petitioner, Elizabeth, or the piece of carpet that was removed from the bathroom floor by investigators. Meredith Chambers, a DNA analyst employed with the State Forensic Lab, testified that she tested swabs collected from the bathroom carpet, the Remington 700 rifle taken from the bathroom floor, and Petitioner's cell phone and that the results identified from the swabs collected were consistent with Petitioner's DNA.

Petitioner subsequently gave another recorded statement to police on January 7, 2008, and provided details about the events that occurred on the night of the crime that were consistent with his prior recorded statement. In that second recorded statement, Petitioner offered, among other things, further details regarding the nature of his strained relationships with Elizabeth's father and sister. However, Petitioner again denied having any prior domestic violence incidents with Elizabeth. He also offered further details about his relationship with Harvey Hersman and his belief that he was responsible for the shooting.

Mr. Hersman was interviewed by Sergeant Clendenin, who determined that Mr. Hersman had a plausible alibi at the time of the murder because he was with his wife that day. Sergeant Clendenin interviewed Mr. Hersman's wife and she confirmed Mr. Hersman's alibi. Sergeant Clendenin also testified that Mr. Hersman's cell phone records indicated that he had not called either Elizabeth's or Petitioner's phone, contrary to

7

Petitioner's statement. Thus, Mr. Hersman was ruled out as a suspect.[4] No arrests were made following the initial investigation of the crime.

Seven years later, James Milam, Nicholas County Prosecuting Attorney, wrote a letter in June of 2014 to Lieutenant Colonel Jack Chambers with the West Virginia State Police requesting that they reopen the investigation of Elizabeth's murder on the basis of "evidence which has come to light in another murder in the Birch River area." The case was re-investigated by Corporal D.P. White, a West Virginia State Police cold case investigator. He testified before the grand jury on September 9, 2014.

At the grand jury hearing, Corporal White testified that although Petitioner bled heavily on the day Elizabeth was shot, and although he told police that he dropped his phone while hiding in the bathroom and fumbled to recover it in his blood pools, his hands were relatively clean when he met officers at the door. He testified that prior to leaving the residence for the hospital, Petitioner pointed out a bullet hole on the side of the house and said that he believed the shooter was in a white pickup truck in the parking

---

[4] Sergeant Walter Shafer, an officer with the Nicholas County Sheriff's Department, saw an individual who he believed to possibly be Harvey Hersman walking past the Go-Mart on Route 82 near Petitioner's home as he was responding to the scene following
Petitioner's 911 call. However, after reviewing mug shots of both Mr. Hersman and Mr. Hersman's brother, Sonny Propps, Sergeant Walters determined that the individual he saw that day was Mr. Propps.

lot of the school adjacent to his house. He also testified that a bullet recovered from the vicinity of Elizabeth's body adjacent to her head, and another recovered from the side of the house, had no human tissue and blood on them.

Corporal White testified that pursuant to the autopsy report, the projectile track of the bullet recovered from Elizabeth's body was inconsistent with the manner in which Petitioner described the incident. The projectile tract was from front to back, left to right and downward. Although there was a pool of blood underneath where Elizabeth laid on the porch, there was no blood spatter anywhere. Furthermore, no blood spatter was found on the porch where Petitioner stated he was shot, and there was no path of blood where Petitioner stated that he turned toward the door. Corporal White testified that there was also what appeared to be a bullet hole in the bathroom floor where Petitioner told police he hid, along with a substantial amount of blood. There was also a blood trail from the bathroom leading back out to the front porch.

Corporal White also testified that following the murder, Petitioner's house burned down, and it remained an unsolved arson case. However, despite the fire, the original concrete porch remained intact and a new mobile home had been attached. He testified that using a laser rangefinder, the distance to Petitioner's porch from the school was 262 yards, and would have required the rifle to be held "three inches high" to hit Elizabeth as it did. However, automobiles were parked between the school and

Petitioner's porch when Elizabeth was shot. He testified that Petitioner's pants were found to be negative for gunshot residue and positive for LeadFree. He testified that he believed LeadFree was a cleaning solvent used to clean firearms. The bullets that passed through both Elizabeth and Petitioner were not recovered.

Corporal White testified regarding the domestic violence petition that Elizabeth had filed against him in April of 2007, wherein she stated that Petitioner had shoved her around, slammed her to the floor, and threatened her, making her fear for not only her life but for the safety of their kids. He also testified regarding the divorce papers that were found hidden in the springs underneath the driver's seat in Elizabeth's car that indicated that his Elizabeth was planning to file for a divorce.

With respect to Petitioner's allegations that he believed Harvey Hersman had shot them, Corporal White stated those allegations were not true. He indicated that Mr. Hersman, who had an alibi, was now deceased and had been killed in an unrelated case. Although Petitioner told police that the shot that wounded him came approximately twenty seconds after the shot that killed Elizabeth, Corporal White told the grand jury that upon his re-interview of every witness, neighbor and various teachers at the adjacent school, these witnesses told police that they heard shots approximately three to eight minutes apart, with the first shot being loud, as if it was outside, and the second shot muffled, as if it was inside.

Corporal White also testified about the allegations Petitioner made in a third recorded statement given in 2014, after Corporal White told Petitioner that based upon the trajectory of their wounds, they could not have been shot from the school parking lot. Petitioner surmised that his neighbor, Mike Butcher, a known alcoholic, may have shot them from an upstairs window in his home. Corporal White indicated that although Mr. Butcher was deceased, having died from natural causes, he interviewed the woman that Mr. Butcher lived with at the time of the murder, Lexy Cutlip. Ms. Cutlip remembered that Mr. Butcher was heavily intoxicated on the day in question. She granted Corporal White permission to come into their home and operate a laser rangefinder from the upstairs window targeting Petitioner's front porch. Corporal White testified that he determined, once again, that it was physically impossible for the bullet to strike Petitioner and Elizabeth from that location, based on the trajectories.

Corporal White testified that he never received any specific information from the prosecutor regarding the new evidence that had come to light in another murder investigation in the Birch River area, other than that he was told "it was due to receiving a conversation with one of the defense attorneys here on – on another murder, and that's what led him to bring this to me." While Corporal White knew that there was only one other open murder investigation in the Birch River area, he did not obtain any evidence from that investigation or speak with the attorneys involved in that case. Based on the

11

testimony of Corporal White, the Nicholas County Grand Jury returned an indictment in September 2014.

In December 2014, Petitioner filed a motion to dismiss the indictment on the ground that the grand jury testimony of Corporal White was speculative, misleading and tantamount to fraud. During a hearing held by the trial court on January 16, 2015, Petitioner's counsel provided lengthy argument concerning portions of the grand jury transcript and the State objected to the motion. In an order entered March 25, 2015, the trial court denied Petitioner's motion finding that Petitioner had not shown that Corporal White's grand jury testimony was willfully or intentionally fraudulent, and therefore, the court was not permitted to "go behind an indictment" to inquire into the evidence considered by the grand jury.

Prior to trial, the State filed a motion to admit intrinsic evidence of domestic abuse. Specifically, the State sought to introduce evidence of: (1) prior domestic violence between Petitioner and Elizabeth that occurred on April 22, 2007, resulting in an emergency domestic violence protective order obtained by Elizabeth, and other prior incidents of domestic violence occurring in November 2006 and March 2007; (2) ongoing marital problems between them; and (3) threats made by Petitioner to Elizabeth. Petitioner opposed the motion, arguing that the April 22, 2007, incident was isolated, the domestic violence proceeding was voluntarily dismissed by Elizabeth, and

12

that Elizabeth told the family court that she was "angry" when she filed her petition. An in camera hearing was conducted on June 12, 2015, and the court heard testimony from Sergeant William Nunley, a Nicholas County Sheriff's Department officer, who responded to the April 22 domestic call; Tabitha Hooker, a domestic violence advocate who assisted Elizabeth in filing the petition for domestic violence protective order; Catherine Gregory ("Catherine"), Elizabeth's sister; and Michelle Cowger ("Michelle"), Elizabeth's daughter.

On August 7, 2015, the circuit court entered an order granting the State's motion and admitting the evidence, finding the evidence of domestic violence on April 22, 2007, intrinsic. However, the court found statements made by Elizabeth to Sergeant Nunley and Ms. Hooker regarding the April 22, 2007, incident to be testimonial in nature and barred by the confrontation clause. Each of the four witnesses presented were permitted to testify as to their observations and actions. The court determined that Catherine and Michelle were permitted to testify at trial about statements Elizabeth made to them. The court found the instances occurring prior to that event to be "too remote to be intrinsic" and engaged in a Rule 404(b) analysis, ultimately determining that

13

petitioner's prior violence against Elizabeth was relevant and more probative than prejudicial.[5]

At trial, the State elicited testimony from Dr. Zia Sabet, the State medical examiner who conducted Elizabeth's autopsy, indicating that the entrance wound on Elizabeth's body was near her clavicle and the exit wound on her "mid-lower back." No bullet was found in Elizabeth's body upon autopsy examination. Dr. Sabet opined that if she had been sitting upright when the bullet struck her, as Petitioner alleged in his prior statements, and if the shot was fired from the distance Petitioner claimed, the only way a bullet could have entered and exited Elizabeth's body in the manner it did was if that bullet had been fired "from the top or . . . third or fourth floor on some building or maybe [from an] airplane." When asked if Dr. Sabet could determine what size bullet likely killed Elizabeth, he testified that he could not make a determination due to the skin's elasticity.

---

[5] The circuit court also concluded that three exhibits offered by the State during the hearing (the police report prepared by Sergeant Nunley, Ms. Hooker's notes from her meeting with Elizabeth, and the domestic violence protective order) would not be admissible at trial. In determining that the Rule 404(b) evidence was admissible, the court ordered that the proper limiting instructions required by *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994) and Rule 105 of the West Virginia Rules of Evidence would be provided.

The State's trajectory and blood spatter expert, Sergeant Michael Lynch with the West Virginia State Police, presented various trigonometry calculations to the jury to demonstrate that if Petitioner had been sitting upright when she was shot, from the distance Petitioner claimed in his statements, the shooter would have had to have fired from at least several hundred feet above Elizabeth. Sergeant Lynch stated that the location of Elizabeth's wounds were consistent with her being shot from a much closer distance while she was in a different position such as bent over to tie her shoes, getting ready to leave. He also noted the lack of blood in the photographs despite the fact that he opined she would have bled immediately. With respect to Petitioner's injuries, Sergeant Lynch testified that the location of the entry and exit wounds that Petitioner suffered were inconsistent with his own sketched representations that he drew posturing himself on the porch. He testified that there should have been blood trails and stains visible on the front porch if Petitioner was shot in the manner in which he claimed.

With respect to Petitioner's claim that he was shot shortly after Elizabeth was hit, the State presented testimony from Donna Park, JoAnn Davis, Betsy Strickland, and Mitzi Frame, who were inside the nearby elementary school at the time of the shooting. Donna Park testified that she was teaching in a classroom on the backside of the building near the playground when she heard one loud gunshot that sounded like it came from behind the building. When she looked out the window to determine whether someone had shot at the school, she did not see any people or movement anywhere. The

15

other three witnesses were also working at the school and were located in the multi-purpose room on the other end of the building, near the parking lot. When they heard the first shot, which they testified sounded very loud and close, they looked at the window and observed an older model white truck. They each testified that there was a delay of approximately five minutes between when they heard the initial shot and when they heard the later one. Each of the witnesses had different recollections regarding whether the white truck was still present at the time they heard the second shot fired.[6]

Finally, Michelle testified that she observed several arguments between Elizabeth and Petitioner. During two of those arguments, one in November 2006 and the other in March 2007, Petitioner struck or was otherwise physically aggressive toward Elizabeth. She also testified about two separate occasions on which Petitioner threatened Elizabeth's life. One incident occurred on April 22, 2007, when Michelle was supposed to drive Petitioner's Camaro to the prom. At some point throughout the night, Michelle

---

[6] JoAnn Davis, who worked part-time as a parent coordinator at the school, testified that the truck was moving when she observed it and she heard the second gunshot five minutes later. Betsy Strickland, a special education teacher, testified that the white truck was still in the parking lot at the time the second shot was fired. Mitzi Frame, who worked as a tutor, testified that when she saw the truck after hearing the first gunshot, it was rolling, headed down towards Birch River. The State also presented testimony from Petitioner's neighbor, Katie Coffman, who testified that while she was sitting near a partially opened glass door in her dining room on the day of the shooting, she heard two shots from the direction of Petitioner's house. Like the teachers that testified, Mrs. Coffman testified that she heard the second shot five minutes after she heard the first shot.

and Petitioner got into a dispute over her use of the car and Michelle decided to take Catherine's car instead. Michelle testified that once Petitioner found out that they had left his car parked at her grandfather's house, he threatened that "Catherine or anybody in [her] family better not move the car, or he was going to kill [Elizabeth]." Catherine testified that Elizabeth also called her that night and when she learned that Catherine gave Michelle her own car and had then driven Petitioner's Camaro to their father's house to park it, Elizabeth told her "[h]e can't know you drove it down there. Don't tell him. . . . He's on his way home. Don't call here. He can't know." Elizabeth filed a domestic violence petition on the same night. Michelle also testified that subsequently, in the summer of 2007, Elizabeth got into a shouting match with Petitioner, during which Elizabeth said she was "gonna pack her bags" and Petitioner replied that "he was gonna bury her before . . . she left him."

Michelle further testified that in either August or September of 2007, she went with Elizabeth to pick up divorce papers, started filling them out, and then hid them under the Dale Earnhardt seat covers in Elizabeth's car. Those divorce papers, which were discovered when Petitioner sold Elizabeth's car, were the subject of testimony and exhibited at trial. Catherine testified that because she knew Elizabeth was going to divorce Petitioner, she had the name on Elizabeth's gravestone changed to reflect her maiden name. Michelle also provided testimony about the various types of guns that

17

Petitioner kept in the home and in his vehicle. She testified specifically that Petitioner kept a .22 and a .9 millimeter handgun in his truck.

At the conclusion of the evidence, the jury found Petitioner guilty of murder in the first degree. He was sentenced to a term of life imprisonment in the state penitentiary without the possibility of parole. Petitioner now appeals his conviction.

## II. STANDARD OF REVIEW

Petitioner presents four issues for this Court's consideration, each of which have specific review standards.[7] Accordingly, instead of setting forth a general standard of review, we will discuss the specific standards of review separately as we address each issue presented.

## III. DISCUSSION

### A. *Refusal to Dismiss the Indictment*

---

[7] While Petitioner's brief asserts six assignments of error, the last two assignments merely provide: (1) that the cumulative effect of all error assigned denied his right to a fair trial and (2) that all other error apparent from the face of the record should be considered. Because Petitioner fails to address, factually or legally, either of these two errors, we deem them waived.

18

Petitioner alleges that the State obtained the indictment against him by making several critical fraudulent misrepresentations before the grand jury. Specifically, Petitioner identifies four pieces of evidence presented to the grand jury that he contends are indicative of the State's fraudulent efforts to obtain an indictment.

First, Petitioner argues that none of the "bullet holes" that Corporal White identified were ever tested or confirmed to be bullet holes, with the exception of the piece of flooring cut out of the bathroom, which he alleges was determined not to contain a bullet hole. Second, he alleges that there was no gunshot residue located on either Elizabeth or Petitioner, or any of the items submitted to the State Forensic Lab for gunshot residue testing, including the piece of carpet removed from the bathroom, Elizabeth's red shirt, and Petitioner's blue jeans. He maintains that significantly, Petitioner's blue jeans did not test positive for LeadFree, as Corporal White told the grand jury. Rather, they tested positive for "lead wipe" and Mr. Cochran, the State Forensic Lab examiner, testified that, "I did find lead wipe around those defects to show that those were consistent with the passage of a bullet." Petitioner argues that contrary to the grand jury testimony of Corporal White, Mr. Cochran testified that the substance identified on Petitioner's blue jeans was not a substance used to wipe off lead or gun powder residue.

19

Third, Petitioner alleges that Corporal White's representation that Petitioner "shot himself in the leg to try and make himself look like a victim" was willfully and intentionally fraudulent because this theory was not supported by the evidence presented at trial. Fourth, Petitioner contends that Corporal White's testimony concerning Petitioner's alleged motive that he did not want Elizabeth to divorce him and statements related to a domestic violence protective order that was initially obtained but subsequently dropped by Elizabeth were also misrepresentations. Petitioner also alleges that the basis for the reinvestigation of this case was based upon a false representation made by the prosecuting attorney of Nicholas County in a letter indicating that new evidence had been discovered when Corporal White testified during the grand jury hearing that no such evidence was discovered or pursued by him. In response, the State asserts that Petitioner failed to make a prima facie showing of fraud.

"Our standard of review of a motion to dismiss an indictment is generally *de novo*." *State v. Davis*, 205 W.Va. 569, 578, 519 S.E.2d 852, 861 (1999). The well-settled rule in West Virginia is that "[e]xcept for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." Syllabus, *Barker v. Fox*, 160 W.Va. 749, 238 S.E.2d 235 (1977).

20

In *State ex rel. Pinson v. Maynard*, 181 W. Va. 662, 383 S.E.2d 844 (1989), we observed that:

> Criminal defendants have frequently sought to challenge the validity of grand jury indictments on the ground that they are not supported by adequate or competent evidence. (citations omitted). This contention, however, often runs counter to the function of the grand jury, which is not to determine the truth of the charges against the defendant, but to determine whether there is sufficient probable cause to require the defendant to stand trial. (citations omitted).

*Pinson* at 665, 383 S.E.2d at 847. Thus, we have held that: "'[m]ost courts hold that as a general rule, a trial court should not grant a motion to dismiss criminal charges unless the dismissal is consonant with the public interest in the fair administration of justice.' Syl. Pt. 12, in part, *Myers v. Frazier*, 173 W.Va. 658, 319 S.E.2d 782, 786 (1984)." *Id.* at Syl. Pt. 4. Furthermore,

> "[D]ismis[s]al of [an] indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261-62, 108 S.Ct. 2369, 101 L.Ed.2d 228, 238 (1988) (citing *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring)).

*Id.* at Syl. Pt. 6. *See also State v. Slie*, 158 W.Va. 672, 213 S.E.2d 109 (1975); *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966). Moreover, "[t]he mere fact that some illegal or improper evidence has been received before the grand jury. . . will not invalidate an indictment where other legal evidence was received in its support." *State v. Clark*, 64 W. Va. 625, 63 S.E. 402, 403 (1908).

21

The question before this Court is whether Petitioner made a prima facie case that such fraud occurred before this grand jury. With respect to Corporal White's comment related to the bullet hole in the bathroom floor and his representation that Petitioner shot himself in the leg in an effort to deceive law enforcement, these statements are not fraudulent simply because they are inconsistent with statements of the accused. As previously stated, the issue of whether the hole in the bathroom floor was actually caused by a bullet was in dispute at trial. Although Mr. Cochran, the State's firearms expert, could not confirm the presence of chemical residue demonstrating that the hole was caused by a bullet, he testified that the damage to the wood and the size of the hole were not inconsistent with having been caused by a bullet. He stated that if a bullet had passed through carpet or padding before going through the wood, any of the residues that he would have been looking for would have been removed, and thus, he did not rule out the possibility that the hole in the bathroom floor was caused by a bullet. Additionally, the other evidence introduced before the grand jury concerning the lack of blood spatter on the front porch and the location of the blood trails and pools at the crime scene supported the State's theory that Petitioner was attempting to cover up his involvement. Accordingly, Petitioner has failed to establish that these statements were fraudulent.

In addition, with respect to Corporal White's statement that Elizabeth obtained a domestic violence petition in April of 2007 against her husband in which she stated a genuine fear for her life, the fact that she stated in a subsequent family court hearing that she was "more angry than fearful" when she initially filed the petition and ultimately asked the family court judge not to issue a protective order does not make her initial statements in the petition irrelevant. This Court has recognized that "domestic violence cases inherently present a combination of circumstances that obstruct, yet simultaneously intensify the need for, successful criminal prosecutions: low victim cooperation and high same-victim recidivism." *State v. Mechling*, 219 W. Va. 366, 379, 633 S.E.2d 311, 324 (2006) (citing Tom Lininger, "Prosecuting Batterers after *Crawford*," 91 Va.L.Rev. 747, 768–71 (2005)). For example, "[a]ccording to one recent estimate, eighty to ninety percent of domestic violence victims who appeal to the criminal justice system for help recant or otherwise fail to assist the prosecution at some point in the proceedings." *Id.* (quoting Lininger, 91 Va.L.Rev. at 768 n. 103; Douglas E. Beloof & Joel Shapiro, "Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims' Out of Court Statements as Substantive Evidence," 11 Colum. J. Gender & L., 1, 3 (2002)). Moreover, Corporal White explained to the grand jury that Elizabeth subsequently dropped the domestic violence petition. Thus, White's statements about the domestic violence petition were not fraudulent.

23

Likewise, Corporal White did not lie or misrepresent to the grand jury that Petitioner knew that Elizabeth was planning to divorce him. The following exchange occurred between the prosecutor and Corporal White during the grand jury proceeding:

> Q: And that this was a premeditated murder in your opinion based on his finding out that she was planning to divorce or separation (sic)?
>
> A: Yes, sir. I'm not sure exactly what caused this. I don't know if he knew about the divorce or not. To my knowledge, he still doesn't know that we discovered the divorce papers. What makes me as a police officer believe that it was a premeditated killing is the great steps he has taken in the last six and a half years to conceal what happened on that front porch.

Thus, Petitioner fails to show how Corporal White's statements regarding Petitioner's alleged motive to kill Elizabeth were fraudulent.

With respect to Corporal White's statement that Petitioner's pants tested positive for LeadFree, he told the grand jury:

> [Petitioner's] pants was cut off him . . . They was collected by our crime scene team, and they was sent to our lab, and . . . they tested negative for gunshot residue. What they did test positive for, however, was something our crime lab referred to as LeadFree. Anybody that hunts and has firearms, you have to clean those firearms, do you not? . . . Again, I'm no expert, but my cleaning solvents . . . contains a substance called LeadFree."

The State contends that given the technical nature of the term "lead wipe," and taking into account both White's admission that he is not a ballistics expert and his considerable

24

familiarity with firearms in general as a police officer and hunter, it is understandable that he might misconstrue this particular piece of evidence.

The characterization of this evidence was undoubtedly incorrect. Despite this, "the mere fact that some illegal or improper evidence has been received before the grand jury . . . will not invalidate an indictment where other legal evidence was received in its support." *Clark*, 64 W. Va. at 625, 63 S.E. at 403; *see also United States v. Estes*, 793 F.2d 465, 466 (2d Cir. 1986) (holding that "the mere fact that some incompetent or privileged testimony is heard by a . . . grand jury" will not "invalidate an indictment returned by it"); *State v. Bonham*, 184 W. Va. 555, 558, 401 S.E.2d 901, 904 (1990) (holding that "although the Court believes that the chief investigating officer's testimony was improper, the State did introduce substantial legal and competent evidence upon which the grand jury reasonably could have found the indictment against the defendant" and therefore the Court "cannot conclude that the testimony of the chief investigating officer was so prejudicial as to invalidate the indictment").

Despite the fact that Corporal White's testimony concerning LeadFree was incorrect, this statement alone was not so prejudicial as to invalidate the indictment. There was other substantial and legal evidence presented to the grand jury upon which it could have indicted Petitioner, including: (1) the projectile track of the bullet wounds on Elizabeth's body being inconsistent with Petitioner's description of the incident; (2) the

25

lack of blood spatter, although there was a pool of blood underneath where Elizabeth laid on the porch; (3) the lack of any blood spatter on the porch where Petitioner stated he was shot and no path of blood was found where Petitioner stated that he turned toward the door; (4) the existence of blood leading from the bathroom to the porch where Petitioner met police; and (5) the fact that Petitioner told police that the shot that wounded him came approximately twenty seconds after the shot that killed Elizabeth, although multiple other witnesses told police that they heard shots several minutes apart. This evidence was substantially similar to the evidence eventually presented at trial. Thus, the incorrect evidence did not substantially influence the decision to indict. *Pinson* at Syl. Pt. 6. Accordingly, we conclude that the circuit court's denial of Petitioner's motion to dismiss the indictment was proper.

**B.      *Admission of Evidence Regarding Prior Domestic Violence and Marital Discord***

Petitioner challenges the circuit court's admission of evidence regarding prior domestic violence and marital discord. We will discuss each of these types of evidence in turn.

**i.      *Testimony Regarding Incident on April 22, 2007***

Both Michelle and Catherine testified about the events on April 22, 2007, when Michelle borrowed Petitioner's car and Elizabeth spoke with both her sister and daughter by telephone because she was concerned that Petitioner would be angry.

26

Michelle testified that she heard Petitioner threaten to kill Elizabeth while the two were on the phone that day. The circuit court found that (1) this evidence was intrinsic and not too remote in time to be considered because it occurred close in time to Elizabeth's murder and was reflective of the violent relationship between her and Petitioner; and (2) the statements made by Elizabeth to Michelle and Catherine regarding the events occurring on April 22, 2007, were "out-of-court statements made by someone other than the declarant while testifying" but were nevertheless admissible at trial because they were not offered for the truth of the matter asserted, but were rather admitted solely for the purpose of showing Elizabeth's state of mind and the reasonableness of her actions in fleeing her home, calling 911 and obtaining a domestic violence protective order. The circuit court determined that alternatively, the statements fell within the present sense impression exception to the hearsay rule under Rule 803(1) of the West Virginia Rules of Evidence.[8]

---

[8] Additionally, the circuit court ruled that the testimony of Michelle and Catherine did not violate the Confrontation Clause. Petitioner asserts that he disagrees with the circuit court's determination on this issue, however, he fails to set forth any reasoning supporting this assertion. Because Petitioner fails to develop this argument, we will not address it on appeal. *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and *those mentioned only in passing [which] are not supported with pertinent authority*, are not considered on appeal." (emphasis added) (citation omitted)); *see also Ohio Cellular RSA Ltd. P'ship v. Bd. of Pub. Works of W.Va.*, 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996) (refusing to address issue on appeal that had not been adequately briefed).

Petitioner first asserts that the circuit court's ruling that the events of April 22, 2007, were intrinsic was erroneous because the testimony presented at the evidentiary hearing and trial was that Elizabeth subsequently recanted the allegations and statements she had made to the State's witnesses in filing a domestic violence protective order. Moreover, when questioned by the family law judge about seeking to voluntarily dismiss the domestic violence petition, Elizabeth stated that she was simply "angry", rather than fearful, at the time of the complaint. Petitioner likewise asserts that the circuit court erroneously concluded that evidence of the events on April 22, 2007, was inextricably intertwined with the crime charged and was therefore admissible, as this was an isolated incident.

"A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to a review under an abuse of discretion standard." Syl. Pt. 1, *State v. Varlas*, 237 W.Va. 399, 787 S.E.2d 670 (2016) (citing Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998)). With respect to a trial court's determination that evidence is intrinsic, this Court has explained that:

> Our cases have "consistently held that evidence which is 'intrinsic' to the indicted charge is not governed by Rule 404(b)." *State v. Harris*, 230 W.Va. 717, 722, 742 S.E.2d 133, 138 (2013). In [*State v.*] *LaRock*, [196 W.Va. 294, 470 S.E.2d 613 (1996)], we noted that other bad acts "evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were necessary preliminaries to the crime charged." *LaRock*, 196 W.Va. at 312 n. 29, 470 S.E.2d at 631 n. 29 (internal

quotations and citation omitted). In Syllabus point 3 of *State v. Ferguson*, 165 W.Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983), we held:

> Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial.

*State v. McKinley*, 234 W. Va. 143, 155, 764 S.E.2d 303, 315 (2014). We have further

held that:

> If the proffer fits into the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment. *See United States v. Masters*, 622 F.2d 83, 86 (4th Cir. 1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is . . . appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae"'"). (Citations omitted).

*State v. Bowling*, 232 W. Va. 529, 547, 753 S.E.2d 27, 45 (2013)(quoting *LaRock*, 196

W. Va. at 312 n.29, 470 S.E.2d at 631 n.29).


As the circuit court properly determined, in the six months leading up to her

death, Elizabeth's relationship with Petitioner was "marked by a pattern of domestic

violence, marital discord and threats of violence," and the events on April 22, 2007, were

"illustrative of that relationship and not too remote in time to be intrinsic." Because the

State's theory of the case was that marital issues and domestic violence between

Petitioner and Elizabeth provided his motive to kill her, the circuit court properly

determined that testimony of Michelle and Catherine regarding the events on April 22, 2007 demonstrated the motive and setup of the crime and was "necessary to a full presentation of the case, . . . [and] is appropriate in order 'to complete the story of the crime on trial . . . .'"[9] *Id.*

With respect to the circuit court's hearsay ruling, Petitioner asserts that the circuit court erroneously concluded that the statements made by Elizabeth to Michelle and Catherine were admissible at trial because the State's purpose in admitting such evidence showed Elizabeth's state of mind and the reasonableness of Elizabeth's actions. Petitioner asserts that because Elizabeth testified that she was simply angry with Petitioner when she sought the domestic violence protective order, seeking such an order was certainly "not reasonable" under any analysis. Petitioner further contends that in order to determine that this testimony constituted a present sense impression Rule 803(1) of the West Virginia Rules of Evidence, the circuit court had to erroneously disregard this evidence and also ignore the openly hostile relationship between Michelle and Petitioner as well as her sketchy recollections on the events that she testified about.

---

[9] The trial court also ruled in the alternative that if it had not found the evidence to be intrinsic it would have been properly admitted under Rule 404(b) of the West Virginia Rules of Evidence to show motive and intent to kill.

Hearsay is defined in the West Virginia Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W. Va. R. Evid. 801(c). Ordinarily, hearsay is inadmissible. W. Va. R. Evid. 802. This Court has held that:

> "Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules." Syl. Pt. 1, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990).

Syl. Pt. 3, *State v. Morris*, 227 W.Va. 76, 705 S.E.2d 583 (2010).

Based on the evidence presented in this case, we conclude that the circuit court did not abuse its discretion in determining that the statements made by Elizabeth to Michelle and Catherine regarding the incidents occurring on April 22, 2007, were admissible because they were not offered for the truth of the matter asserted, but were, rather admitted solely for the purpose of showing Elizabeth's state of mind. Because the statements were used for that limited purpose, they did not constitute inadmissible hearsay.

Moreover, as the lower court alternatively recognized, Elizabeth's comments to Michelle and Catherine were made when she was describing the ongoing

31

events that led her decision to seek a domestic violence protective order. Thus, these comments, even if hearsay, would have still been admissible under the "present sense impression" exception in Rule 803(1) of the West Virginia Rules of Evidence, which provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by the hearsay rule. *Id.*

> This Court has stated that:
>
> It is within a trial court's discretion to admit an out-of-court statement under Rule 803(1), the present sense impression exception, of the West Virginia Rules of Evidence if: (1) The statement was made at the time or shortly after an event; (2) the statement describes the event; and (3) the event giving rise to the statement was within a declarant's personal knowledge.

Syl. Pt. 4, *State v. Phillips*, 194 W. Va. 569, 461 S.E.2d 75 (1995), *overruled on other grounds by State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013).

In properly considering the factors outlined in *Phillips*, the circuit court noted that (1) the statements made by Elizabeth were directly after the occurrence of the incident of domestic violence; (2) the statements described the event; and (3) the event giving rise to the statement was within Elizabeth's personal knowledge. *See id.* Accordingly, we conclude that the circuit court's admission of this testimony was not an abuse of discretion.

### ii.    *Testimony Regarding Incidents in November 2006 and March 2007*

The circuit court also addressed the State's request to admit testimony regarding some alleged incidents of domestic violence allegedly witnessed by Michelle in November 2006 and March 2007. Specifically, Michelle testified that she witnessed a physical altercation between Petitioner and Elizabeth in November 2006 when she pulled up in the driveway and saw Petitioner grab Elizabeth's arms "and stuff" and hit her in the arm "a couple times." Michelle testified that she did not intervene but, instead, sat in her car in the driveway. She also testified about another incident that occurred in March 2007 involving an altercation that was related to one of Petitioner's sons. Michelle testified that there was a lot of yelling during the incident and that she witnessed Petitioner shove Elizabeth before the couple continued back into another room and shut the door.

The circuit court determined that Michelle's testimony regarding these incidents of domestic violence in November 2006 and March 2007 were admissible, but that they were too remote to be intrinsic, as they occurred seven to eleven months before Elizabeth's death. Accordingly, the circuit court conducted an analysis under Rule 404(b) of the West Virginia Rules of Evidence and determined that these prior incidents were relevant to show motive and intent to kill Elizabeth, that the incidents were reliable and highly probative of the relationship between Petitioner and Elizabeth, and that the

probative value of this evidence outweighed any danger of unfair prejudice under Rule 403.

Petitioner asserts that the probative value of this proposed evidence is substantially outweighed by the danger of unfair prejudice because it was duplicative and cumulative of the testimony concerning the incident that took place on April 22, 2007. He additionally argues that while Michelle presented testimony concerning the parties' arguments over petty things, the trial court made a significant leap when it characterized these incidents as violence inflicted upon her. Further, as to the court's finding that these statements tended to show Petitioner's motive and intent, he contends that there is no evidence in the record of the June 12, 2015 hearing, nor of the trial, that he had any knowledge as to the existence of the divorce packet or of any plans that Elizabeth had of pursuing a divorce.

With respect to the standard applicable to our review of a Rule 404(b) ruling, we held in *LaRock* that:

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

34

*Larock* at 310, 470 S.E.2d at 620 (footnotes and citations omitted).  In syllabus point one

of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), we held that:

> When offering evidence under Rule 404(b) of the West
> Virginia Rules of Evidence, the prosecution is required to
> identify the specific purpose for which the evidence is being
> offered and the jury must be instructed to limit its
> consideration of the evidence to only that purpose. It is not
> sufficient for the prosecution or the trial court merely to cite
> or mention the litany of possible uses listed in Rule 404(b).
> The specific and precise purpose for which the evidence is
> offered must clearly be shown from the record and that
> purpose alone must be told to the jury in the trial court's
> instruction.

*Id*. at Syl. Pt. 1.  We have provided the following guidance for how a trial court must

consider proposed Rule 404(b) evidence:

> Where an offer of evidence is made under Rule 404(b) of the
> West Virginia Rules of Evidence, the trial court, pursuant to
> Rule 104(a) of the West Virginia Rules of Evidence, is to
> determine its admissibility. Before admitting the evidence, the
> trial court should conduct an *in camera* hearing as stated in
> *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After
> hearing the evidence and arguments of counsel, the trial court
> must be satisfied by a preponderance of the evidence that the
> acts or conduct occurred and that the defendant committed the
> acts. If the trial court does not find by a preponderance of the
> evidence that the acts or conduct was committed or that the
> defendant was the actor, the evidence should be excluded
> under Rule 404(b). If a sufficient showing has been made, the
> trial court must then determine the relevancy of the evidence
> under Rules 401 and 402 of the West Virginia Rules of
> Evidence and conduct the balancing required under Rule 403
> of the West Virginia Rules of Evidence. If the trial court is
> then satisfied that the Rule 404(b) evidence is admissible, it
> should instruct the jury on the limited purpose for which such
> evidence has been admitted. A limiting instruction should be
> given at the time the evidence is offered, and we recommend

35

that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

*Id.* at Syl. Pt. 2. We have further explained that:

It is presumed a defendant is protected from undue prejudice if the following requirements are met: (1) the prosecution offered the evidence for a proper purpose; (2) the evidence was relevant; (3) the trial court made an on-the-record determination under Rule 403 of the West Virginia Rules of Evidence that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave a limiting instruction.

Syl. Pt. 3, *LaRock*, 196 W.Va. 294, 470 S.E.2d 613.

In the present case, the trial court conducted an in camera hearing on June 12, 2015, and heard the proposed evidence of alleged prior abuse. The circuit court's order, which thoroughly analyzes each of the factors required in *McGinnis*, made the proper determination that evidence that Petitioner previously abused Elizabeth would have the tendency to make it more probable that Petitioner intended to and did cause her death, and therefore, it was relevant to show his motive or intent.

In *LaRock*, we elaborated on the importance of evidence of prior violence in a murder prosecution:

The theory underlying the introduction of evidence regarding a prior violent relationship in a murder prosecution is not that the assailant is a bad person and that bad people are likely to commit the charged offense. It is precisely this train of thought that Rule 404 prohibits. Instead, the theory under which such evidence is allowed arises from the idea that,

36

when a defendant has demonstrated the same type of violence towards a victim on a recent occasion, it is probative of his or her intent, motive, malice, and premeditation. Thus, in the present case, the prosecutor understandably attempted to demonstrate some prior animosity to explain why the accused had a motive to do the illegal acts charged in the indictment. . . . . *Not only is evidence of the prior relationship between the defendant and his deceased son relevant, it also is considered crucial evidence in proving premeditation.*

*Id*. at 311-12 n.27, 470 S.E.2d at 631 n.27 (emphasis added). Thus, the fact that Petitioner had demonstrated the same type of violence toward Elizabeth on a recent occasion was relevant and highly probative of the nature of their relationship and Petitioner's motive and intent, and weighing those factors in favor of admissibility, the circuit court's determination that the probative value of this evidence outweighed any danger of unfair prejudice was not an abuse of discretion. *Id*. at 312, 470 S.E.2d at 631. For these reasons, we conclude that this testimony was neither unfair nor duplicative in nature. In addition, while the jury heard Michelle's testimony regarding the fact that Elizabeth planned to divorce Petitioner, Petitioner vehemently denied any knowledge of her plans in closing arguments and the jury heard evidence that the divorce packet had been hidden under the seat covers in Elizabeth's vehicle. The jury weighed all of this evidence accordingly. Thus, the circuit court's admission of this testimony was not an abuse of discretion.

### iii. Testimony Regarding Marital Discord

The circuit court next addressed the State's request to introduce evidence of the marital relationship between Petitioner and Elizabeth. Michelle and Catherine offered testimony regarding other marital problems between the couple, the history of their relationship, and Petitioner's controlling behavior. However, because their testimony covered issues that arose as early as 2001 through 2005, the circuit court determined that historical relationship evidence was too remote in time to be admissible as extrinsic evidence.

Michelle also offered relationship testimony related closer in time to Elizabeth's death. She testified regarding arguments during the summer of 2007 over petty things, Elizabeth's plans to divorce Petitioner, and the divorce packet that she and Elizabeth picked up. The circuit court determined that Michelle's testimony regarding their relationship during the six months preceding Elizabeth's death was relevant and admissible as intrinsic evidence, concluding that "'it seem[ed] doubtful that this case could [be] appropriately presented without such sufficient background information.' *State v. Dennis*, 216 W. Va. 331, 352, 607 S.E.2d 437, 458 (2004)" and was necessary to "'complete the story of the violence [Petitioner] inflicted upon her.' *State v. McKinley*, 234 W. Va. 143, 764 S.E.2d 303, 316 (2014)." The circuit court also concluded that these statements were non-testimonial in nature and did not constitute inadmissible hearsay because they were admitted for the purpose of showing Petitioner's motive and intent, and Elizabeth's state of mind. Petitioner asserts that this testimony was

38

duplicative and cumulative and that these incidents were not indicative of any violence

inflicted upon her. However, for the reasons stated by the circuit court, we conclude that

the circuit court's admission of these statements was not an abuse of discretion.

Accordingly, we affirm the circuit court's ruling on this issue.

### C. *Refusal to Give Instruction on Lesser Included Offenses*

Petitioner alleges that the circuit court failed to instruct the jury on the

lesser-included offenses of second degree murder, voluntary manslaughter, and

involuntary manslaughter. Although Petitioner alleges that he requested these

instructions at trial, he admits that the record reveals no such request and that counsel did

not submit such proposed jury instructions to the trial court. Accordingly, Petitioner

alleges that this was plain error as contemplated by Rules 30 and 52(b) of the West

Virginia Rules of Criminal Procedure. This Court has held that:

> The plain error doctrine contained in Rule 30 and Rule
> 52(b) of the West Virginia Rules of Criminal Procedure is
> identical. It enables this Court to take notice of error,
> including instructional error occurring during the
> proceedings, even though such error was not brought to the
> attention of the trial court. However, the doctrine is to be used
> sparingly and only in those circumstances where substantial
> rights are affected, or the truth-finding process is substantially
> impaired, or a miscarriage of justice would otherwise result.

Syl. Pt. 4, *State v. England*, 180 W. Va. 342, 376 S.E.2d 548 (1988). This Court has held

that, generally:

> "The question of whether a defendant is entitled to an
> instruction on a lesser included offense involves a two-part

39

inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982)." Syl. Pt. 1, *State v. Jones*, 174 W.Va. 700, 329 S.E.2d 65 (1985).

Syl. Pt. 3, *State v. Wilkerson*, 230 W. Va. 366, 738 S.E.2d 32 (2013).

As to the first inquiry identified in *Wilkerson*, there is no question that second degree murder, voluntary manslaughter, and involuntary manslaughter are lesser included offenses of murder. *See* W. Va. Code §§ 61-2-1 through 61-2-5 (2014). With respect to the second inquiry, we must determine whether there was sufficient evidence introduced at trial to support a verdict on one of the lesser-included offenses. "'Jury instructions on possible guilty verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' Syl. pt. 5, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980)." Syl. Pt. 1, *State v. Leonard*, 217 W. Va. 603, 619 S.E.2d 116 (2005). "When there is no evidence to support giving a particular instruction the trial court is not obligated to give that instruction." *State v. Sapp*, 207 W. Va. 606, 615, 535 S.E.2d 205, 214 (2000).

We conclude that in this case, there was no evidence to support giving an instruction on these lesser included offenses because Petitioner presented an identity of

40

the shooter defense. In doing so, Petitioner did not present any evidence from which the jury could have concluded that Petitioner killed Elizabeth without premeditation. Nor did he claim that he was suddenly provoked by something Elizabeth said or did. *See e.g., Sapp*, 207 W. Va. at 615, 535 S.E.2d at 214 ("The defendant does not claim he was suddenly provoked by something [the victim] said or did; he claims he did not kill him, [someone else] did. Based upon this evidence, an instruction on voluntary manslaughter was not warranted."). The State offered ample evidence of premeditation and deliberation in demonstrating that Petitioner had committed prior acts of violence against Elizabeth, that Elizabeth had planned to divorce Petitioner, and that Petitioner had threatened to kill her if she tried to leave him. Because there was no evidence relating to second-degree murder or manslaughter introduced at trial, the circuit court was not required to give an instruction on lesser-included offenses and its failure to do so was not plain error.

### D. *Sufficiency of the Evidence*

Petitioner alleges that the circuit court erred in denying his motion for judgment of acquittal because the evidence presented by the State was insufficient to convince a reasonable jury that Petitioner was guilty beyond a reasonable doubt. Specifically, he asserts that despite the State's theory that Petitioner shot Elizabeth and then shot himself in the bathroom, no gunshot residue, flashing or stippling was found on either Petitioner or Elizabeth, and there was no mixing or crossing of the locations where Petitioner and Elizabeth's blood was found. He also maintains that (1) none of the

41

alleged bullet holes were confirmed to be bullet holes; (2) no one was seen coming or leaving the residence around the time of the shooting; and (3) although multiple officers were in exclusive possession of the crime scene for eight hours conducting an extensive investigation using metal detectors, none of this evidence that the law enforcement officers presented at trial implicated Petitioner. Furthermore, he contends that the State failed to establish any motive to kill his wife, as one incident of domestic violence six months prior to the murder wherein she later recanted her statements, and a couple of other arguments, did not establish motive. In response, the State contends that it is evident from the record that the State introduced more than enough direct evidence related to Petitioner's willingness to harm Elizabeth, and a copious amount of circumstantial evidence from which a jury could infer that Petitioner shot her.

We apply a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence. *LaRock*, 196 W.Va. at 304, 470 S.E.2d at 623. With regard to the standard of review applied to challenges to the sufficiency of the evidence, this Court has explained as follows:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

42

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Accordingly, we

have held that:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record *contains no evidence, regardless of how it is weighed,* from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*Id*. at Syl. Pt 3 (emphasis added). In emphasizing the necessity to view all evidence in

the light most favorable to the prosecution and to resolve all evidentiary conflicts in favor

of the prosecution, we have stated:

> When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

Syl. Pt. 2, *LaRock*, 196 W.Va. 294, 470 S.E.2d 613.

This Court has previously ruled that we may accept any adequate evidence, including circumstantial evidence, as support for a conviction. *Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174. It was noted in *Guthrie* that:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Id*. at 668, 461 S.E.2d at 174 (quoting *Holland v. United States*, 348 U.S. 121, 139-40 (1954)).

In the case at bar, the State introduced significant evidence from which a rational jury could have relied in order to satisfy the elements of first-degree murder. The State introduced evidence sufficient to prove the elements of malice and premeditation, including various threats the Petitioner made toward Elizabeth, their history of violence, and Elizabeth's plans to divorce Petitioner.

Furthermore, the State provided ample evidence to implicate Petitioner circumstantially and to discredit his version of the events. The State's trajectory expert and the medical examiner opined that based upon the location of Elizabeth's entry and exit wounds, it was virtually impossible for Elizabeth to have been shot in the manner in

44

which Petitioner claimed at the time of the shooting. Additionally, the State presented undisputed testimony regarding the lack of a blood trail on the front porch and the lack of blood on any furniture or walls, along with the existence of blood leading from the interior bathroom and bedroom to the front door. Unexplainably, the two bullets that were recovered from the scene had no human blood or DNA on them. This evidence, combined with all of the witness testimony regarding whether the hole in the bathroom floor was actually a bullet hole, and the heavy amount of Petitioner's blood found in the bathroom, all circumstantially implicated the Petitioner.

The jury heard the testimony of Petitioner's crime scene reconstruction and ballistics expert, Mark McMillian, who countered the State's experts' opinions and provided his own opinions regarding the manner in which the responding officers investigated the crime scene, gunshot range and distance determinations, and gunshot residue testing, among other things, and the jury weighed all of this evidence accordingly. Additionally, the jury heard a great deal of testimony from various witnesses in and around the elementary school that day concerning the gunshots that they heard and the fact that they all remembered hearing the second gunshot approximately five minutes after the first gunshot.

Moreover, although Petitioner argues that no gunshot residue was found on Petitioner's hands, the State introduced evidence that the bathroom sink was wet and

45

Petitioner's hands were noticeably clean when he emerged from his home after the arrival of emergency personnel. The jury also heard evidence that directly following the incident, Petitioner asked to have his hands tested for gunshot residue to demonstrate that he "didn't shoot no gun." Further, Petitioner called Sergeant Lilly's attention to a bullet hole located on the front of the house as he was lying on his back while paramedics prepared to transport him from the scene.

All of this evidence supported the State's theory that Petitioner took efforts to cover up his involvement, clean the gunshot residue off of his hands, and then bring his lack of gunshot residue to the attention of law enforcement, and these were all credibility determinations that the jury properly made. Based upon the evidence presented, we find no error in the circuit court's conclusion that the evidence was sufficient to support the jury's verdict.

## IV. CONCLUSION

We affirm the judgment of the Circuit Court of Nicholas County convicting Petitioner of first-degree murder and sentencing him to life in prison without the possibility of parole.

Affirmed.